RECVD 21 APR '23 11:00 USDC-ORP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OREGON

Elizabeth Diane Downs,
       Plaintiff

Case Number: 3:23-cv-595-YY

   v.

Oregon Board of Parole Members
Michael Washington, Diane Rea,
(?) Hanners, Steve Powers,
Candace Wheeler, Darcy Baker,
Aaron Felton, Isidro
Thompson, Christine
Hernnan (sp), Michael Hsu,
Greta Lowry, Patricia Cress,
John Bailey, James Taylor,
      Defendants

42 USCS § 1983

CIVIL RIGHTS COMPLAINT

---

PLAINTIFF'S OPENING BRIEF

Plaintiff Pro Se

Elizabeth Diane Downs    W49707
CCWF    512-02-1L
PO Box 1508
Chowchilla, CA    93610-1508

4-8-2023

FILED 21 APR '23 11:00 USDC-ORP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OREGON

Elizabeth Diane Downs,
      Plaintiff

    v

Oregon Board of Parole Members
Michael Washington, Diane Rea,
(?) Hanners, Steve Powers,
Candace Wheeler, DarcyBaker,
Aaron Felton, Isidro
Thompson, Christine
Hernnan (sp), Michael Hsu,
Greta Lowry, Patricia Cress,
John Bailey, James Taylor,
      Defendants

Case Number: 3:23-cv-595-YY

42 USCS 1983

CIVIL RIGHTS COMPLAINT

---

## I. AUTHORITY

Since 1999, Defendants have co-operated to illegally imprison Plaintiff, in violation of Oregon Statutes.

> DOE v BARGER, 193 F.Supp.2d 1112 (2002)
> 42 USCS 1983 may be used to enforce
> Statutory Rights as well as Constitutional
> Rights.

Plaintiff is not seeking release from prison by this action. She's requesting financial compensation for decades of cruel and unusual punishment inflicted on her by State Actors who've used their badges of authority to deprive her of the right to due process guaranteed by the 6th and 14th Amendments of the United States Constitution.

Page 1 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

NERIS v VIVONI, 249 F.Supp.2d 146 (2003)
In order to state a claim for deprivation of
rights under 42 USCS 1983, Plaintiff must
show that;
    (1) conduct was committed by persons
        acting under color of law;
    (2) defendant's conduct in fact deprived
        plaintiff of rights, priviledges, or
        immunities secured by Constitution
        of laws of the United States;
    (3) defendant's conduct caused depravation
        of Federal Constitutional Rights; and
    (4) defendant's conduct must have been
        intentionally grossly negligent, or
        must have amounted to reckless or
        callous indifference to Constitutional
        Rights of others.

Plaintiff will prove the Defendants used their badges of authority to deprive Plaintiff of her Constitutional Rights of due process, of liberty, and of the right to be free of cruel and unusual punishment.

RICHARDSON v McKNIGHT, 521 U.S. 399; 117 S.Ct. 2100 (1997)
42 USCS 1983 basically seeks to:
    (1) deter State Actors from using their
        badge of authority to deprive individuals
        of their Federally guaranteed right; and
    (2) provide related relief

DUCHESNE v SUGARMAN, 566 F2d 817 (2nd Cir. 1977)
42 USCS 1983 was designed to protect individuals
against misuse of power made possible only because
the wrongdoer is clothed with authority of State Law.

Defendants' decades-long violation of Oregon State Law has deprived Plaintiff of her Constitutional Rights guaranteed by the 5th, 8th, and 14th Amendments.

## II. EXHAUSTION OF APPELLATE REMEDIES

Plaintiff has exhausted her appellate remedies and found
no relief in State Court since 1999:

       2000 --- Downs v Board of Parole --- A110640
               Petition for Writ of Habeas Corpus

       2001 --- Downs v Board of Parole --- S048896
               Petition for Writ of Mandamus

       2001 --- Downs v Board of Parole --- A116441; S052025
               Petition for Writ of Habeas Corpus

       2002 --- Downs v Board of Parole --- A118501; S050963
               Petition for Writ of Habeas Corpus

       2008 through 2020 --- INTERREGNUM ---due to
               Defendants' refusal to respond to
               Plaintiff's appeals

       2020 --- Downs v Board of Parole --- A175039; S069222

Plaintiff can do no more to seek relief in the State Courts
where loyalty to Fraternal Order supercedes allegiance to the
Law.

## III. DEFENDANTS

All Defendants listed are/were Oregon Parole Board Members
whove co-operated for decades to inflict cruel and unusual harm
on Plaintiff in violation of the 8th Amendment of the United
States Constitution.

Former Board Member Michael Washington is now employed as
an Assistant Attorney General, where he is neatly situated to
influence the State's disposition of Plaintiff's appeals, after
sitting on the Oregon Board of Parole for EIGHT YEARS (1998-2006).

Or will a further follow-up reveal Michael Washington was originally a State's Attorney employed by the Oregon Attorney General, who was then delegated to sit on Plaintiff's Parole Board applications from 1998 (when she became eligible for parole) until 2007 (after Plaintiff turned her attention to seeking habeas relief from imprisonment by her Director of Corrections)?  A trial of facts will be required to suss out the whole truth.

---

## IV. STATEMENT OF CLAIMS

CLAIM #1 --- Defendants Washington, Rea, and Hanners    1999

In 1984, Plaintiff was sentenced under ORS 161.725 (App. 1). In order to lawfully sentence Plaintiff as a dangerous offender, Oregon Statute required a psychiatrist to find she was suffering from a SEVERE personality disorder (App. 2).

The State employed Dr. George Suckow to interview Plaintiff for 40 minutes, after which he diagnosed Plaintiff with a narcissistic personality disorder (App. 3).  Not a SEVERE narcissistic personality disorder required by Law because there was no classification of a narcissistic personality disorder being SEVERE in the DSM III in 1984 (or even today).

Dr. Suckow admitted he manufactured a false diagnosis because he felt there should be one (App. 4).  The Court should've immediately dismissed the State's request to have Plaintiff sentenced as a dangerous offender when the State's expert admitted he manufactured a false diagnosis to satisfy Statutory requirements. But the Court did not.

Dr. Suckow justified his finding by claiming Plaintiff exhibited narcissistic tendancies in her childhood.  When asked to explain, the following exchange took place between State's witness, Dr. George Suckow, and Defense Counsel, James Jagger (App. 4,page 2945):

Q.  ... in DSM III, there isn't any sum classification of narcissistic personality disorder of being severe or not severe?

A.  No.

Q.  So that is pretty much left up to the individual practitioner?

A.  I think it is, yes ... When you look at personality disorders, they're lifelong patterns of behaviour.

Q.  What evidence did you have that prior to age 15 of Diane Downs that she had a narcissistic personality disorder?

A.  When she was 13.  She gave a history of being sexually molested.

Q.  That has nothing to do with narcissistic, does it?

A.  Yes, it does.

Q.  What?

A.  Narcissistic people often are seductive in order to gain attention.

Q.  Excuse me, was your observation that she had been seductive to the person who molested her and had almost invited this, it was her fault?

A.  What I'm saying is narcissitic people are often seductive in behavior in order to gain attention.

Q.  But being molested has nothing to do with narcissistic personality, does it?

A.  In and of itself, no, but what I'm saying is that the propensity to be molested is there.

Q.  Only if you're seductive?

A.  Yes.  And most narcissistic people are.

Page 5 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

After this testimony the Court Sentenced Plaintiff as a dangerous offender BECAUSE Dr. Suckow swore little girls get sexually abused as a result of their own psychological deviance. But why did he feel that way?

We'll probably never know what happened to little George that shaped his young mind to this way of thinking. We do know the 1930's and 1940's were not kind to females. Male psychiatrists imprisoned "mad women" in mental hospitals for being angry when their cheating husbands spent food-momey on other women.

We also know mental hospitals in the 1940's and 1950's were not "healing institutions". They were "insane asylums" instituted to hide away people who exhibited epilepsy, Alzheimer's, autism, dropsy, homosexual tendencies, etc, etc. These unfortunates were labelled "criminally insane". They were lobotomized and subjected to chemical experimentation to "rid the patient of hysterias" (a word derived from the word WOMB).

Directors of these Insane Asylums were feared as "gods" in so far as no one dared challenge their authority for fear of being labelled insane and of being committed alongside the poor misfortunates they were trying to save.

So why, in 1952, did young George set a course to become the Director of every mental hospital in the State of Oregon? One might hope his goal was to reform the State's Insane Asylum System. Unfortunately, that isn't what adult George did. In his own words (App. 4, pages 2936-2938):

Page 6 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

> "I trained in psychiatry at the Oregon State
> Hospital in Salem, finishing that training
> in 1964 ...
>
> "... in 1966 I then came to the Oregon State
> Hospital, assumed the DIRECTORSHIP of the
> psychiatric security unit ... devoted to the
> examination and treatment of ... criminal
> offenders ... I was DIRECTOR in charge of
> running the whole program ... for seven years ...
>
> "I then [in 1973] went to Dammasch State Hospital
> [for the criminally insane] where I was the
> CLINICAL DIRECTOR [overseeing the administration
> of experimental drugs] for seven years and then
> returned to the Oregon State Hospital".

Dr. Suckow omitted, from his 1984 testimony, the fact he
returned to the Oregon State Hospital in 1980 because Dammasch
State Hospital was shut down. Under his DIRECTORSHIP, too many
patients were dying from the experimental drugs and proceedures
he approved.

As Director, Dr. Suckow kept all State-owned Mental Hospitals
overcrowded (at Tax Payer expense). The State of Oregon received
kickbacks from drug companies for the use of their patients on
which their experimental drugs were forced.

This was just one arm of the corruption in the Oregon
Judicial System that got Oregon Director of Corrections Michael
Franke killed in 1988 after the Oregon Governor brought him in
from New Mexico to clean it up. This is the same corrupt
System that wrongfully convicted Frank Gable for Director Franke's
murder to protect one of their own.

Defendant Washington knew this in 1999 because he worked

Page 7 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

for the Oregon Attorney General.  But no one in Oregon had the
courage to stand up to the twisted words of Dr. George Suckow
until 1999.

Dr. Terry Kupers addressed Dr. Suckow's archaic, misogynistic
view of the world (and by extension Diane Downs) in a letter to
the Oregon Board of Parole (App. 5):

> "Our understanding of 'severe personality disorder'
> has grown quite a bit since 1984 ... many women who
> have been diagnosed 'severe personality disorder' in
> the past are now known to have suffered severe and
> repeated traumas such as physical and sexual abuse
> during childhood, and actually suffer from a complex
> posttraumatic stress disorder that was MISTAKENLY
> DIAGNOSED AS A SEVERE PERSONALITY DISORDER DURING
> THE 1980's (See Judy Herman, Trauma and Recovery,
> Basic Books, 1992)".

Not only did Dr. Kupers discredit the so-called 'severe
narcissistic personality disorder' put upon Plaintiff by Dr.
Suckow in 1984, Dr. Suckow himself admitted he manufactured a
false, unqualified diagnosis to aid the State in Sentencing
Plaintiff as a dangerous offender.

Defendants Washington, Rea, and Hanners knew these things
in 1999.  Appendix 4 (attached to this Complaint) is the Oregon
Board of Parole's copy of Dr. Suckow's Sentencing Transcript,
provided to Plaintiff in 2020 for her last parole consideration
hearing.

Defendant Washington, a State's Attorney who sat on the
Board of Parole for 8 years, certainly knew:

> MONROE v THIGPEN, 932 F2d 1442 (11th Cir. 1991)
> A parole board may not engage in "flagrant or
> unauthorized action" by knowingly relying on
> false information.

Page 8 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

So, when the Defendants learned from Dr. Terry Kupers that
Dr. Suckow's archaic diagnosis of Plaintiff was in error, they
were legally obliged to conduct a parole consideration hearing,
but they didn't.  BAF#6, dated 6-23-1999 reflects (App. 6 ):

> " ... this Board action is to respond to the
> letter from Terry Kupers, M.D., M.S.P., regarding
> subject's 'dangerousness'.  The Board denies the
> request for an earlier parole consideration
> hearing.  The information submitted is insufficient
> to find the inmate is no longer dangerous".

ORS 144.228 (1)(b) doesn't require that the Plaintiff be
"no longer dangerous".  The Oregon Statute reads (App. 7 ):

> "At the parole consideration hearing, the
> prisoner SHALL BE GIVEN A RELEASE DATE in
> accordance with the applicable range [MATRIX]
> ... if the condition which made the prisoner
> dangerous is absent or in remission".

Dr. Kupers made it very clear the "condition which made
the prisoner dangerous (SEVERE narcissitic personality disorder)
was absent" because it never existed in the first place.  The
Law required the Defendants to release Plaintiff within her
MATRIX RANGE (10 to 14 years, according to BAF#6).

Defendants' arbitrary refusal to conduct a parole consider-
ation hearing and release Plaintiff in 1999, denied Plaintiff's
liberty, required by Oregon Law.

> COSTANICH v DEPT. OF SOCIAL HEALTH SERVICES,
> 627 F3d 1101, 1110 (9th Cir. 2010)
> The Ninth Circuit Court of Appeals found
> "substantive due process protects individuals
> from arbitrary deprivation of their liberty
> by the government".

Page 9 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

The mandatory language of ORS 144.228 (1)(b) required
Defendants to conduct a parole consideration hearing and release
Plaintiff within her MATRIX (no later than 5-9-1999). Their
refusal to even conduct a parole hearing in 1999 resulted in
the continued illegal imprisonment of Plaintiff for 24 years
(as of this writing).

Plaintiff is seeking $100 a day in compensation for
Defendants Washington's, Rea's, and Hanner's violation of her
Civil Rights.

---

CLAIM #2 --- Defendant Washington                    $2004$

On 10-13-2004, the Oregon Court of Appeals remanded a case
for resentencing because the prisoner's dangerous offender
sentence under ORS 161.725 was found to be Unconstitutional.

On 11-16-2004, Plaintiff applied for parole, based on the
Oregon Court of Appeals' finding (in <u>Warren</u>), that her sentence
was also Unconstitutional and the Board could not hold her in
prison based on an illigitimate sentence.

On 1-20-2005, Plaintiff submitted a follow-up letter to
the Board, seeking a status report because the Board failed to
respond to her request for release.

On 1-25-2005, Plaintiff petitioned for Habeas Corpus Relief
in Washington County Case No: C-05-0300-CV, on this issue (App. 8).

On 1-28-2005, the Clerk of the Court sent a copy of Plaintiff's
Petition to the Oregon Attorney General's Office (App. 9).

On 1-28-2005, Defendant Washington (a State's Attorney)

Page 10 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

dated Board Action Form #9, denying Plaintiff's application
for parole (App. 10).

Defendant Washington's written response is telling of his
close connection with the Attorney General's Office.  He wrote:

> "The Board is not the proper body to address
> subject's case based on a court ruling where
> the Board was not a party.  Subject must pursue
> her appeal rights to address those issues".

Defendant Washington allegedly wrote these words on 1-25-2005
(the day Plaintiff's Petition was filed) and allegedly mailed
BAF#9 to Plaintiff the day the Attorney General received Plaintiff's
Petition (1-28-2005).  Coincidence or communication?

Either way, Defendant Washington failed to address the fact
the Board has the authority to override an illegal, Unconstitutional
Sentence and parole prisoners any time they want within the MATRIX.

Defendant Washington was (and still is) a State's Attorney.
He knew the implication of so many Oregon cases being remanded
for resentencing because ORS 161.725 was found to be Unconstitutional.
He knew Plaintiff's Sentence was equally illegal and could not be
lawfully supported.  He knew the full Board could override Plaintiff's
sentence and release her.

Defendant Washington's failure to parole Plaintiff in 2005
has led to a continued violation of her Civil Rights for over
18 years.  Plaintiff is seeking $100 a day in compensation for
Cruel and Unusual Punishment, beginning with the date 1-25-2005,
for this second Claim, to be added on to the damages sought for
Claim #1.

Page 11 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

CLAIM #3 --- Defendants Wheeler, Powers, and Baker      2008

On 12-9-2008, the Oregon Board of Parole finally conducted the parole consideration hearing required in 1999.  Sorta.

On 12-9-2008, Defendants Wheeler, Powers, and Baker issued their findings in Board Action Form #11 (App. 11).  Sorta.

The Board issues the exact "form letter" at the conclusion of every dangerous offender parole consideration hearing.  Except for changes to names and dates, this Court wouldn't know which prisoner's hearing was being addressed.

In this case, Plaintiff discussed the confession by State's expert, Dr. George Suckow, that he fabricated a false diagnosis to assist the State in sentencing Plaintiff as a dangerous offender when she was not.  Plaintiff reintroduced the finding of Dr. Terry Kupers, that Plaintiff does not suffer from a severe personality disorder.  And, Plaintiff sought release from prison on the basis she is not a dangerous offender, therefore her term of imprisonment terminated in 1999.

A reading of BAF#11 referrences none of these issues.  It was as if there had been no hearing at all.  There was more information offered in Board Action Forms, in which the Board refused to conduct a hearing.

Oregon Law required Plaintiff to seek Administrative Review (by the Board of Parole) before appealing their decision to the Oregon Court of Appeals.  Plaintiff did so 1-21-2009.  The Board did not respond for 16 months.

Page 12 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

On 12-9-2008, Defendants Wheeler, Powers, and Baker set Plaintiff's next parole consideration hearing for 12-9-2010. Had they answered Plaintiff's Request for Administrative Review in a timely manner, an appeal would have followed.  That didn't happen.

On 5-28-2010, the Defendants handed down their Review Response #5, knowing the 2010 parole proceedings would begin in September (roughly 3 months later).  They were betting on Plaintiff needing to focus her attention on her upcoming Board hearing and not on appealing her previous hearing.  They were right.

The Defendants did respond to Plaintiff's claims in their Review Response #5 (App. 12):

> "The Board will respond to your claims below.
> ... In fact, the Board is required by ORS 144.
> 228(2) (1981) to consider 'all information
> regarding such person'. ... The Board weighed
> ... all the other information available at your
> hearing ... The Board finds that it is not
> required by rule or statute to have any specific
> findings such as you allege in the psychology
> evaluation".

Not only is the Board wrong, the Defendants' finding is an arbitrary, capricious abuse of discretion.  ORS 144.228 (1)(b) clearly says:

> "At the parole consideration hearing, the prisoner
> SHALL BE GIVEN A RELEASE DATE ... if the condition
> which made the prisoner dangerous is absent or in
> remission".

Dr. Suckow admitted he manufactured a false diagnosis of a severe narcissistic personality disorder, in 1984.  That was the alleged "condition which made the prisoner dangerous", that

Page 13 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

needed to be absent or in remission for Plaintiff to be granted
a release date within her MATRIX (1999). Based on Dr. Suckow's
admission, Plaintiff never did suffer from a severe personality
disorder, therefore it is fair to say it was still absent (unless
the State is willing to concede they have mentally damaged
Plaintiff by wrongfully imprisoning her for 38 years).

Furthermore, Dr. Terry Kupers found that Plaintiff was not
suffering from a severe personality disorder in 1999. The
information the Defendants claim to have examined are proof
"the condition which made the prisoner dangerous [in 1984] is
absent". That being the fact, the Law DOES REQUIRE the Board
to give Plaintiff a release date.

Rather than comply with the Law, Defendants Wheeler, Powers,
and Baker chose to delay their Review Response for 16 months and
deny they're required to abide by "rule or statute" in this case.

> HENDERSON v DEPT. of VETERANS AFFAIRS,
> 878 F3d 1044, 1048 (2017)
> The Federal Court can intervene when there is
> (1) an arbitrary, capricious abuse of discretion
>     not in accordance with law; or
> (2) when Laws, Rules, or regulations haven't
>     been followed

The Defendants' written admission they aren't required to
abide by the Statutes is proof enough they willfully violated
Plaintiff's Constitutional Right to due process.

Plaintiff is seeking $100 a day in compensation for the
shenanigans of Defendants Wheeler, Powers, and Baker that denied
her 2008 parole and subsequent appeal of their arbitrary decision.

CLAIM #4 --- Defendant Felton                    *2010*

On 12-9-2010, the Oregon Board of Parole conducted the
parole consideration hearing they scheduled in 2008.  Member
Wheeler opened the hearing by saying they were being attended
by the Oregon State Police and the FBI.  Someone had been
stalking Plaintiff for years.  Just prior to her 2010 hearing,
the stalker had threatened to "cause alot of trouble" for the
Parole Board Members if they paroled Plaintiff.

Member Wheeler then went on record with the statement,
"We have no reason to deny you parole."  What followed next was
a lengthy discussion about where Plaintiff would parole.  It
had been Oregon's custom to parole high-profile cases to places
undisclosed to the media.  Member Baker feared for the safety
of Plaintiff's parents if she paroled to them.  Plaintiff feared
her stalker would threaten her parents to force her to reveal
herself if she didn't parole to them.

It was a terribly emotional exchange that left Member Baker
and Plaintiff in tears.  Member Wheeler called for a recess and
said she didn't know how they'd do it, but they'd find a way to
not separate Plaintiff and her parents.

Half an hour later the Board Members returned from their
recess.  Member Wheeler announced they would be denying Plaintiff
parole for 10 years and they'd see her in 2.  When asked if she
understoof, Plaintiff said, "No".  Member Wheeler repeated their
decision to deny Plaintiff parole for 10 years and they'd see
her in 2 years.  Member Felton said almost nothing at all.

Page 15 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

Nearly two months later, Plaintiff received a written finding in Board Action Form #12 (App. 13). She was stunned. Defendant Felton's report had absolutely nothing to do with the hearing attended by Plaintiff.

Defendant Felton bases the Board's decision to deny parole on events that NEVER happened during the hearing. For example (App. 13, page 3):

> "... during questioning, inmate dispassionately recounted a crime scene recreation sequence from her trial in which the head of the 'Danny Doll' (as inmate called it) was being knocked back and forth by bullets from the shooter's gun".

This was NEVER said by Plaintiff during the parole hearing (or at any time in her life). The "crime scene recreation sequence" Defendant Felton was writing about was when Prosecutor Fred Hugi brought a life-size model of Plaintiff's car into the courtroom during closing arguments. He placed dolls in three quadrants of the car and positioned the car sideways to give the jurors full view of the inside of the car. Plaintiff, seated at the trunk end of the car, was not elevated like the jurors and could see nothing inside the car. There would be no reason on earth Plaintiff would give an account of something she never saw and never could see from her position in the courtroom.

Furthermore, when Prosecutor Hugi recreated his version of the crime, he didn't load the gun with real bullets and shoot anything in the courtroom. The "head of the Danny Doll" (as Defendant Felton wrote it) would only have been "knocked back and forth" if real bullets had struck it (which DID NOT HAPPEN).

Page 16 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

Plaintiff NEVER said these things.  In fact, the crime itself was never discussed during the 2010 parole consideration hearing.  Defendant Felton completely fabricated BAF#12 out of thin air to justify denying Plaintiff parole for 10 years.

Plaintiff requested Administrative Review AND requested a copy of the parole consideration hearing transcript so she could prepare her appeal with the Court of Appeals.

Defendant Felton failed to return a Review Response to answer Plaintiff's request for review.  He also refused to send Plaintiff a copy of the hearing transcript.  Plaintiff made three separate requests.  Defendant Felton responded to none of them.

Plaintiff remembered how the Board waited 16 months to respond to her 2008 request for Administrative Review.  She waited years for the 2010 response.  It never came.  Defendant Felton's refusal to abide by ORS 144.335 and OAR 255-080-0001, barred Plaintiff's right to appeal the Board's 2010 decision to deny her parole for 10 years.

Ten years later, Plaintiff received a copy of (what falsely purports to be) her 2010 parole consideration hearing.  IT IS AN ABSOLUTE FORGERY!!!  It is extremely lengthy.  Plaintiff will attach the first few pages to this CIVIL COMPLAINT (App. 14), but will wait until trial to enter the audio MP3 File distributed to news media, Universities, and Psychologists employed by the State to evaluate Plaintiff before her 2020 parole consideration hearing.

Plaintiff's brother called the Oregon Board of Parole to request a transcript of the 2010 Hearing in 2020. The Board, having no reason to believe the caller was really related to Plaintiff, sent him an Mp3 Audio File of the alleged 2010 Parole Consideration Hearing. It's clear the Board's goal was to put that particular Audio File into every hand they could.

The problem was, the Mp3 Audio File is a forgery and an expert voice analyst will be able to prove it. Member Felton opens the Hearing on 12-9-2010, claiming to be the Chairperson, then introduces the two Board Members to his Left. He wasn't seated in the middle chair because his role was not central to Plaintiff's Hearing. Member Wheeler made the introductions, asked the questions, and directed the flow of the Hearing. NOT FELTON.

Pages 3 and 4 of APPENDIX 14 amount to an arm-wrestling match between a female speaker and Mr. Felton. It was ludicrous! The Board of Parole held Plaintiff's fate in their hands. Plaintiff has never been a mouthy b---h in any letter to the Board or in any face-to-face with them. Yet this entire Mp3 Audio File is one big middle finger to the Members of the Board. THIS NEVER HAPPENED!

Plaintiff wrote to tell the Board she was waiving her right to appear in person because her presence created a circus atmosphere that often hindered Judges and Board Members from ruling in her favor, even when they wanted to. The Board sent for Plaintiff anyway.

Before introductions were made, Member Wheeler asked Plaintiff
to "please stay" because she believed the Board had more to say to
her than they needed to hear from her.  These words piqued Plaintiff's
curiosity and put her in a very good, hopeful mood (nothing like
the snarky attitude depicted by some voice-actress in Felton's
Forgery).

On page 5 of APPENDIX 14, Felton turned the entire conversation
on its head and made it seem Plaintiff was sassing (thereby
alienating) HIM before the Hearing had even begun.  That was a
lie.  THAT NEVER HAPPENED.

By page 6, Member Felton seems to have finally wrangled Plaintiff
into agreeing to attend her own Parole Consideration Hearing against
her will.  Curiouser still is the way in which Felton imagines
Plaintiff finally concedes with, "All right.  I will stay and we
will converse".  Converse?  What in the world is that?  Some kind
of code word?!

Plaintiff is nearly 68 years old and she can't recall ever
using the word "converse" in her entire life.  She also speaks in
contractions, which are lacking in the female speakers dialogue
throughout the whole of the forged Mp3 Audio File.

The transcript of this forgery is 116 pages long.  Plaintiff
isn't going to address every element in this opening brief.  That
is better suited to be addressed by the voice analyst when he
uses his technology to prove the woman speaking with Felton IS NOT
Plaintiff.

Page 19 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

Plaintiff's 2010 Parole Consideration Hearing was recorded in video form because the Hearing was conducted via SKYPE. Plaintiff is certain the video-file existed years afterward because she saw a silent video-clip of the hearing. In 2008, Plaintiff wore a blue and white baseball shirt. In 2010, she wore a pale blue blouse (seen on the news clip). Plaintiff will subpoena the 2010 video-file to support her claim that Member Felton forged an Mp3 Audio File for the purpose of damaging others' opinions of Plaintiff before her 2020 Parole Consideration Hearing.

> JOHNSON v CHAIRMAN NEW YORK BOARD OF PAROLE,
> 363 F.Supp. 417 (1973)
> "The Board remains a body of public officers
> charged with a special statutory responsibility
> toward prisoners. The prisoner's parole
> interests imply procedural rights that are
> real, and at minimum entitle prisoner to relief
> against discrimination, or abuses of discretion,
> or the introduction into parole decision-making
> of illicit considerations. Cf. Smartt v Avery,
> 370 F2d 789 (6th Cir. 1967)".

Plaintiff received this transcript of the forgery of the alleged 2010 Parole Hearing from the Lane County District Attorney (who received the falsified Mp3 Audio File from the Oregon Board of Parole). District Attorney Patricia Perlow and DDA Miller were given to believe the fabricated Mp3 Audio File was an authentic replication of Plaintiff's 2010 Parole Hearing. It colored their view of Plaintiff and not in a good way.

> LONSDORF v SEEFELDT, 47 F3d 893, 895 (7th Cir. 1995)
> culpability rests in the intentional misrepresentation
> of a forgery as being authentic

Parole Board Member Aaron Felton knew he was doing the wrong thing for the wrong reasons.  If he believed Plaintiff's words, deeds, and history was justification to deny her parole, he'd have relied on her actual Hearing Transcript to support his decision to deny her parole in 2010.  The fact he refused to provide Plaintiff with a copy of the Hearing Transcript in 2011 is proof he needed time to find a voice-artist and draft a script to fabricate a damaging version of the Parole Hearing he wished he'd witnessed.

The fact that Board Member Felton distributed the forgery to the Lane County District Attorney, to the Psychologist hired by the 2020 Board to evaluate Plaintiff, to the media, and to every College of Law and Psychiatry in Oregon is evidence of the fact Plaintiff will never again get a fair Hearing or Trial in the State of Oregon.

Board Member Felton not only deprived Plaintiff of her Constitutional Right to due process in 2010, but in every future Hearing.  There's no putting the genie back into the bottle.  It's for that reason Plaintiff is seeking $100 a day in compensation for damages incurred by Member Felton in 2010, to be added to the awards previously named.

CLAIM #5 --- Defendants Thompson and Hernnan (sp)        2018

Every year following her 2010 Parole Consideration Hearing, Plaintiff wrote to the Board of Parole to request a transcript of the Hearing and to seek a Status Update on when the Board would respond to her Request for Administrative Review of BAF# 12, dated



12-10-2010.  Neither the transcript of the Hearing nor Review
Response #6 ever came, though Plaintiff sought a Status Update
annually.

On 5-3-2018, Defendant Thompson perceived Plaintiff's
request for closure on her 2010 Hearing as a Request for an
Interim Parole Consideration Hearing and denied the mistaken
request (App. 15).  It was as if Defendant Thompson hadn't read
Plaintiff's letter at all.

While Plaintiff doesn't have a copy of her letter to the
Board, her interest and focus are memorialized in Defendant
Hernnan's Review Response dated 7-3-2018 (App. 16).  She wrote:

> " ... you are asking the Board to reopen and
> reconsider the Board's past decisions, and
> the Board denies that request ... that could
> have been raised through established procedures
> of administrative review".

That was the point Plaintiff was trying to make.  She did
Request Administrative Review of BAF# 12 and the 2010 Board
never responded.  One of the issues Plaintiff asked the 2010
Board to review was their illegal decision to deny her parole
for 10 years when ORS 144.228 says the Board shall conduct a
Parole Consideration Hearing every 2 years for prisoners sentenced
under ORS 161.725.

Every year Plaintiff urged the 2010 Board to resond to her
Request to Review that decision so she could appeal.  Should
there be any question that what Plaintiff is saying is true,
read the response Defendant Hernnan gave to Plaintiff's letter
(App. 16, page 2):

> "Finally, you appear to allege that the Board
> did not have the authority to set a ten-year
> defferal of an exit interview .. a decision
> was made in 2010.  Your argument on this issue
> are untimely".

It's clear from Defendant Hernnan's response that Plaintiff
was trying to resolve her 2010 Hearing with the 2010 Board.  It's
also clear that while Defendants Thompson and Hernnan denied
Plaintiff an Interim Hearing because she couldn't readdress
"old issues", these same two Defendants literally quoted the
2010 Board in their Review Response #6.  How does that hold water?

Defendant Hernnan said Plaintiff "could have" raised her
issues in an Administrative Appeal.  That means Plaintiff's
Request for Administrative Review was removed from her file
sometime between 2010 and 2018 (during which time Defendant Felton
was creating his forged Mp3 Audio File).

Defendants Thompson and Hernnan may argue they didn't know
what was happening with Plaintiff's Parole Hearings in 2010, but
their argument rings hollow.  Board Members rotate out of their
positions at an alternating pace.  Their service, conversation,
and experiences overlap.  It's unlikely none of these Defendants
knew what the others were doing over the years.

> RODRIGUEZ v U.S. PAROLE COMMISSION, 594 F2d 170 (7th Cir. 1979)
> "Only an unusual prisoner could be expected to
> think that he is not suffering a penalty when,
> even though he is eligible for parole and might
> be released if granted a hearing, he is denied
> that hearing".  Citing Warden v Marrera, 417 U.S.
> 653 (1974)

Whether Plaintiff was seeking an Interim Parole Consideration

Hearing or not, Defendants Thompson and Hernnan thought she was. They had a lawful responsibility to conduct a hearing and judge Plaintiff on her current conduct. Eight years had passed since Defendant Felton denied Plaintiff parole in 2010. Defendants Thompson and Hernnan were arbitrary and capricious in their decision to deny Plaintiff a Hearing based on the 2010 Board's decisions to deny Plaintiff parole.

Given the fact Plaintiff had been incarcerated 34 years in 2018, without one violent incident on her record, there's every reason to believe she'd be able to prove she was not a danger to society and worthy of parole IF she could have presented her evidence at a Parole Consideration Hearing.

Because Plaintiff was denied that opportunity in 2018, she's been incarcerated an extra five years without cause. For that reason, Plaintiff is seeking $100 a day for every day she was arbitrarily denied a Parole Consideration Hearing by Defendants Thompson and Hernnan in 2018, to be added to the total amount already accrued for offenses committed by the aforementioned Defendants.

2020

CLAIM # 6 --- Defendants Hsu, Lowry, Cress, Bailey, and Taylor

On 9-23-2020, the Full-Panel convened to conduct Plaintiff's Parole Consideration Hearing, again via SKYPE, as was done in 2008 and 2010.

Prior to the Hearing, Plaintiff was interviewed by psychologist Michelle Guyton, per requirements of ORS 144.228. Dr. Guyton asked

Page 24 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

Plaintiff why she thought the 2010 Board denied her parole.  Plaintiff said she didn't know since Member Wheeler began the Hearing by saying they had no reason to deny her parole, then ended the Hearing by denying her parole for 10 years.

Dr. Guyton wrote in her evaluation for the Board that Plaintiff was untruthful because her version of facts differed from the documents and evidence provided to her by the Board.  Dr. Guyton said straight out to Plaintiff that her version of the 2010 Parole Consideration was a lie and that she was using lies to manipulate her evaluation.  That's when Plaintiff asked her brother to listen to the Mp3 Audio File and discovered it was a forgery designed to convince Dr. Guyton (and everyone else who listened to it) that Plaintiff wasn't playing with a full deck.

This was in August 2020, before the 9-23-2020 Parole Consideration Hearing.  Plaintiff immediately notified the Defendants of the fact they'd wittingly or unwittingly provided Dr. Guyton with a false document and that the psychologist's evaluation of her was skewed.

> JONES v RAY, 279 F3d 944, 946 (11th Cir. 2001)
> The Board's reliance on false information in a
> parole file violates procedural due process
>
> LONSDORF v SEEFELDT, 47 F3d 893, 895 (7th Cir. 1995)
> The Board is culpable whether the false information
> was intentionally or unintentionally misrepresented
> as true
>
> TY Inc. v SOFTBELLY'S Inc., 353 F3d 528, 536 (7th Cir. 2003)
> The Board's witness tampering and misconduct
> disaffected the prisoner's ability to present
> her case

The Board based its decision to deny Plaintiff parole on
Dr. Guyton's report (App. 17, page 2, paragraph 10).  Defendant Hsu
wrote:

> "The Board relied on the psychological evaluation
> prepared by Dr. Guyton".

Rather than rehash every flaw in Defendants' BAF# 14, Plaintiff
has appended her Request for Administrative Review for this Court
to examine (App. 18).  Dr. Guyton's report is 44 pages long and
will be introduced by a Psychologist NOT employed by Defendants to
misrepresent Plaintiff in an unfair light.

For purpose of submitting her Initial Civil Suit, Plaintiff
would have this Court refer to page 4 of her Request for Adminis-
trative Review to see that Dr. Guyton noted over and over and
over, on page after page after page, that Plaintiff is NOT violent,
NOT aggressive, NOT threatening, and she has NO MAJOR MENTAL
DISORDER.

Pursuant to ORS 144.228 (1)(b)(A), the Board SHALL give the
Prisoner a release date when the condition which made the prisoner
dangerous is no longer present.  In 1984, the Sentencing Court
alleged Plaintiff was suffering from a "severe narcissistic
personality disorder".  THAT was the condition which made Plaintiff
dangerous because of a propensity to commit future acts of violence.

Dr. Guyton, on page 40 of her report, said Plaintiff had NOT
been aggressive or exhibited any behaviour approaching violence
the past 37 years.  On page 36 Dr. Guyton found Plaintiff suffered
from NO severe personality disorder.  Oregon Law required the

Page 26 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)



Defendants to parole Plaintiff in light of Oregon Statute and Proceedure. But, they didn't.

Their response to Plaintiff's Request for Administrative Review was two words: REVIEW DENIED (App. 19). Always trying to sweep Plaintiff under the rug with as little fuss as possible.

Plaintiff appealed. The Court of Appeals said the Board had to do better than that. Defendant Hsu issued a do-over in BAF# 15 (App. 20) and followed with RR# 8 (App. 21) in which they quoted 2005 and 2017 cases regarding ORS 144.228:

> "The Board notes that your psychological diagnosis does not need to be the same as the one made at your sentencing."

This is incorrect. The 1984 version of ORS 144.228 (1)(b) very clearly and specifically states (App. 7):

> "At the parole consideration hearing, the prisoner SHALL be given a release date in accordance with the applicable range and variation permitted if the condition which made the prisoner dangerous is absent or in remission".

In this case, Dr. Guyton found Plaintiff was suffering from NO SEVERE MENTAL DISORDER. That should've been the end of it, but Defendants twist the Law to argue Plaintiff can be denied parole for any subsequent severe personality disorder she acquired during her 40 years of incarceration. That is NOT what the Law says, and Dr. Guyton didn't find Plaintiff to be suffering from a severe personality disorder.

Defendants' goose chase, designed to convince this Court

Page 27 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

that Plaintiff is a danger to society is patently unfair and
unsupported by the Psychologist they claim to rely on to deny
Plaintiff parole.

Furthermore, Defendants' false claim that Plaintiff is
suffering from a brand new severe personality disorder she contracted
while in the custody of the Oregon Department of Corrections
opens a whole new can of worms.  Does that make all previous
Defendants even more liable because they refused to release
Plaintiff from custody in accordance with the Law years before
she was damaged by decades of wrongful incarceration?

But, wait.  Shouldn't Defendants be required to at least
come up with a new name for Plaintiff's alleged severe personality
disorder before they use it to deny her parole?

Either Plaintiff is suffering from the original severe
narcissistic personality disorder (which Dr. Guyton says she's
not) or Plaintiff is suffering from a new severe personality
disorder (which Dr. Guyton says she's not).

Defendants' argument is the shell game, intended to confuse
this Court into believing Plaintiff's arguments are fruitless.
Defendants had a Statutory responsibility to release Plaintiff
from custody in 2020 but they didn't.  Their refusal to abide
by the Law deprived Plaintiff of her Constitutional Right to
Due Process and has led to her wrongful incarceration two years
past the date Defendants were required to release her.  For that
reason, Plaintiff is seeking $100 a day for every day Defendants
Hsu, Lowry, Cress, Bailey, and Taylor denied her parole.

Page 28 --- CIVIL RIGHTS COMPLAINT (Parole Board Members)

## V. PRAYER FOR RELIEF

Since 1999, Defendants have worked in unison to deprive Plaintiff of her freedom. In so doing, they've had to deny her Constitutional Right to Due Process. There's no way to turn back the hands of time. All Plaintiff can do is sue for compensation.

Plaintiff prays this Court will grant her an Evidentiary Hearing so all the facts can be heard by all.

> RHODEN v ROWLAND, 10 F3d 1457, 1460 (9th Cir. 1993)
> The Ninth Circuit Court of Appeals required an
> evidentiary hearing after Plaintiff developes
> a record of prejudice.

Plaintiff further prays this Court will award her the monetary damages she requests and for such other relief as this Court deems just.

I swear under penalty of perjury the foregoing is true.
Dated this 8th day of April 2023.

_____

Elizabeth Diane Downs     W49707
CCWF       512-02-1L
PO Box 1508
Chowchilla, CA     93610-1508